# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TY HARRIS,** | |
| **Plaintiff,** | |
| | **Case No. 1:06-cv-00638-RJL** |
| **v.** | **Judge Richard J. Leon** |
| **CHARLES H. RAMSEY, CHIEF,** | |
| **District of Columbia Metropolitan** | **July 23, 2008** |
| **Police Department, *et al.,*** | |
| **Defendants.** | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Plaintiff Ty Harris, through counsel, respectfully files this opposition to the motion to dismiss of Defendants District of Columbia, former Police Chief Charles Ramsey and Officer Jeffery K. Tolliver.[1]  This Court should deny the motion concerning the following issues:

1. Officer Tolliver is entitled to qualified immunity for violating Mr. Harris' constitutional rights.

2. Officer Tolliver had a reasonable good faith reason to search Mr. Harris' vehicle and believe Mr. Harris possessed a weapon.

3.  Plaintiff cannot assert a claim of negligent training and supervision because he has not named an expert.

4. This Court should not maintain supplemental jurisdiction over this case.

---

[1]  Jeffery K. Tolliver is an MPD sergeant.

# I. STATEMENT OF FACTS.

On July 20, 2004, Metropolitan Police Department Officer J.K. Tolliver stopped Mr.
Harris' car on Wisconsin Avenue, NW, near Massachusetts Avenue, at approximately 9:00 pm.
Mr. Harris only realized Officer Tolliver was pulling him over when Officer Tolliver drove his
car in front of Mr. Harris' car and stopped.  (Harris Deposition 27:4-9).

Officer Tolliver walked over to the driver's side of Mr. Harris' car and stared at Mr.
Harris for some time, then drew his gun and pointed it at Mr. Harris.  While pointing the gun at
Mr. Harris, Officer Tolliver screamed, "Let me see your motherfucking hands bitch!  Get out of
the fucking car!  Get out!  Keep your fucking hands up."  (Mr. Harris' response to Defendants'
First Interrogatories, Question 2).

Mr. Harris did not know why Officer Tolliver had pulled him over and Mr. Harris had
done nothing to provoke Officer Tolliver's belligerent behavior.   Mr. Harris got out of his car as
directed.  Officer Tolliver stood approximately six feet away from Mr. Harris while pointing a
gun at the latter's head.  Mr. Harris was very afraid because he believed that Officer Tolliver was
out of control and would shoot him.  (Mr. Harris' response to Defendants' First Interrogatories,
Question 2).

Officer Tolliver then yelled, "Move to the fucking back of the car!  Put your hands on the
trunk!"  Mr. Harris complied with this order and Officer Tolliver processed Mr. Harris' driver's
license.  During this processing, Officer Tolliver continued screaming at Mr. Harris and held the
gun to Mr. Harris' back.  (Mr. Harris' response to Defendants' First Interrogatories, Question 2).

Soon after Officer Tolliver called in Mr. Harris' information, approximately ten or more
police cars arrived and surrounded Mr. Harris' car.  All the officers got out of their cars and two

of the officers questioned Mr. Harris about the situation.  Mr. Harris said that he did not know

why Officer Tolliver pulled him over.  In response, one of the officers screamed, "What do you

mean you don't know!  Why did you get pulled over?"  Mr. Harris reiterated that he did not

know the reason for the stop.  (Mr. Harris' First Amended Complaint, ¶ 14).

Officer Tolliver then put his gun away and questioned Mr. Harris about whether or not he

had a weapon.  Mr. Harris said that he did not.  Then Officer Tolliver asked if Mr. Harris had

something in his car under the seat.  Mr. Harris said no.  Officer Tolliver said, "So I'm not going

to find nothin' under your seat?"  Mr. Harris continued to say no, but Officer Tolliver kept saying

that there better not be anything under Mr. Harris' seat.  He accused Mr. Harris of putting

something under his seat.  (Mr. Harris' First Amended Complaint, ¶ 15).

Officer Tolliver searched the inside of the car with his flashlight, without Mr. Harris'

consent.  The only item Officer Tolliver found in the car was an empty plastic bag from a local

Fresh Fields grocery store.  (Mr. Harris' First Amended Complaint, ¶ 16).

Following the search, Officer Tolliver informed Mr. Harris that he could sit in his car.

Mr. Harris chose to remain where he was.  Officer Tolliver then talked to the other officers

present and four or five officers encircled Mr. Harris.  Officer Tolliver asked Mr. Harris what

was in his pocket.  Mr. Harris responded by pulling out an elastic jogging bandage for his knee

and throwing it on the top of his trunk.  Officer Tolliver said they would let him go in a few

minutes.  (Mr. Harris' First Amended Complaint, ¶ 17).

Officer Tolliver continued to question Mr. Harris about what the latter had under his seat.

Mr. Harris reiterated that he had nothing under his seat.  Officer Tolliver said that he pulled Mr.

Harris over because allegedly someone in another car had screamed out to him to check under

Mr. Harris' seat.  This alleged individual did not stop, but drove on by.  Officer Tolliver has never identified this individual.  (Mr. Harris' First Amended Complaint, ¶ 18;  Tolliver Deposition 10: 16-17).

Mr. Harris asked Officer Tolliver if he always pulled his gun and pointed it in people's faces.  Another officer yelled that doing so was for protection.  Mr. Harris also asked if the officers normally cursed out drivers they pulled over.   Officer Tolliver previously received a reprimand for cursing at a federal officer while on duty and was the subject of multiple civilian complaints against him as an officer in the District of Columbia and Coconut Creek, Florida.  The officers ignored Mr. Harris' question about the cursing.  (Mr. Harris' First Amended Complaint, ¶ 19; Attached complaints).

Mr. Harris asked Officer Tolliver for the latter's full name and badge number.  Officer Tolliver gave Mr. Harris his initials and badge number, but refused to show Mr. Harris his identification.  Officer Tolliver told Mr. Harris that he was under no duty to do so.  The officers eventually allowed Mr. Harris to leave.  Mr. Harris shook with fear, anger and embarrassment as he drove away from the scene.  To this day, he feels threatened by and scared of the police.  (Mr. Harris' First Amended Complaint, ¶¶ 19-20).

## II.  STANDARD FOR 12(b)(6) AND  SUMMARY JUDGMENT MOTIONS

### A.  Mr. Harris Has Stated a Claim for Which Relief Can be Granted

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and grant the plaintiff the benefit of the inferences that can be derived from the alleged facts.  *Conley v. Gibson*,  355 U.S. 41, 45-46

(1957); *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can consider only the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice. *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624-25 (D.C. Cir. 1997).

### B. Genuine Issues of Material Fact Exist Making Summary Judgment Inappropriate

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Semaan v. Mumford*, 335 F.2d 704, 705 (D.D.C. 1964). The non-movant needs to establish that only contrary inferences "might be permissible." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

Materiality is "a function of the applicable legal standard." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). A "genuine issue" is one that, if resolved, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

# IV.  ARGUMENT

## A.  Officer Tolliver is Not Entitled to Qualified Immunity
## for Illegally Stopping Mr. Harris and Searching His Vehicle

Defendants claim that Officer Tolliver is entitled to qualified immunity.  However, qualified immunity does not apply where Officer Tolliver violated Mr. Harris' rights by illegally pulling over his vehicle on July, 20, 2004, and subsequently searching the vehicle because a reasonable officer in Officer Tolliver's position would not have acted in this way.  *Saucier v. Katz,* 533 U.S. 194, 201 (2001), states the test for qualified immunity for a public official.  The initial inquiry is:

> Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?
>
> ***
>
> ... if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established ....

The answers to both questions in Mr. Harris' case is "yes."  In their motion, defendants do not dispute that Officer Tolliver violated Mr. Harris' rights.  The Complaint expressly alleges that Officer Tolliver violated a constitutional right and that the right was clearly established.

After determining that an officer's conduct violated an individual's constitutional rights and that those rights were established at the time, the next step is an objective, fact-based determination as to whether a reasonable officer in defendant officer's position would have taken the same actions that violated a plaintiff's rights.  *Anderson v. Creighton,* 483 U.S. 635, 639 (1987).  A police officer is entitled to "qualified immunity if a reasonable officer possessing the

same information *could* have believed that his [or her] conduct was lawful." *District of Columbia v. Evans*, 644 A.2d 1008, 1015 (D.C. 1994).

In this case, a reasonable officer in Officer Tolliver's position would not have stopped Mr. Harris' car, would not have approached Mr. Harris with his gun drawn, would not have cursed at Mr. Harris, and would not have searched his vehicle.  Officer Tolliver did not have any legitimate reason to pull Mr. Harris over:

1. Mr. Harris testified he "was simply driving along the street as any other motorist was it seems likely to me that Mr. Tolliver pulled me over for some reason that had absolutely nothing to do with me driving recklessly or running a — disobeying a traffic signal or a stop sign or someone informing him that my car was stolen"  (Harris Deposition 42:  6-16).

2. Officer Tolliver, or any other officer, did not issue Mr. Harris a ticket or citation for speeding, erratically changing lanes, or violating any traffic law.  (Harris Deposition 45:1; 63: 11-13; Tolliver Deposition 26:15-16).

3. Officer Tolliver did not question Mr. Harris about drinking alcohol that evening, using drugs, or anything related to speeding or changing lanes erratically.  (Tolliver Deposition 38: 7-13).

4. Mr. Harris did not know why he was pulled over and repeatedly asked the officers the reason he was pulled over, frisked and his vehicle searched.  (Harris Deposition 55: 16-17).

5. After Officer Tolliver pulled Mr. Harris over, no officer, including Officer Tolliver, told Mr. Harris that the stop was for speeding or erratically changing lanes. (Harris Deposition 39: 7-10).

6. The first time Officer Tolliver stated that Mr. Harris was speeding was during an interview by the Office of Police Complaints on April 28, 2005, nine months after the incident on July 20, 2004. (Office of Police Complaints Report, 4/28/05).

7. On the tape of the radio run, Officer Tolliver did not state that he was pulling Mr. Harris over because he was speeding or erratically changing lanes. (Radio run transcript).

8. Officers Robert Feretti, Gregory Rock and Keisha Anderson[2] did not hear over the radio that Officer Tolliver pulled over Mr. Harris due to speeding or erratically changing lanes. (Rock Deposition 13: 6-8; Anderson Deposition 20: 7-10; Feretti Deposition 5: 9-14).

9. Officers Rock, Hannibal or Feretti never testified that they heard Officer Tolliver admonish or warn Mr. Harris about the dangers of speeding and erratically changing lanes.

Officer Tolliver also did not have a reasonable belief that Mr. Harris was armed and a threat to officers or other members of the public.

1. Officer Tolliver never alleged that the unknown man in the passing car said Mr. Harris had a weapon or any other illegal contraband. (Tolliver Deposition 9: 12-14).

2. Officer Tolliver did not know the unknown man who allegedly told him that Harris put "it" under his seat. (Tolliver Deposition 10: 16-17).

---

[2] Officer Anderson's maiden name is Hannibal.

3. Officer Tolliver did not have any conversation with the unknown driver. (Tolliver Deposition 10:20-21; 11:1-2).

4. Officer Tolliver did not find a weapon on Mr. Harris or in his vehicle. (Tolliver Deposition 14: 8-9).

5. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that he personally saw Mr. Harris with a dangerous weapon.

6. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that he personally saw Mr. Harris make any suspect or furtive movements while following him and pulling him over.

7. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that another police officer saw Mr. Harris with a dangerous weapon.

8. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that another officer saw Mr. Harris make any suspect or furtive movements before or after Officer Tolliver pulled Mr. Harris over.

9. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that a known and trusted confidential informant or MPD special employee informed him that Mr. Harris was armed or in possession of a weapon, drugs or contraband.

10. Officer Tolliver never stated in his deposition or interview with the Office of Police Complaints that MPD, or any other law enforcement agency, alerted officers to be on the look out for an armed, African American man with dreadlocks driving a Honda Civic.

-9-

11. Officer Tolliver never stated in his deposition or interview with the Office of Police
Complaints that he knew Mr. Harris before July 20, 2004, or had any reason to believe he
was a violent criminal.

Officer Tolliver had no legitimate reason to search Mr. Harris' car.  He did not place Mr.
Harris under arrest and lacked a reasonable belief that Mr. Harris had a dangerous weapon on his
person or in his vehicle.

In their motion, Defendants claim *U.S. v. Green*, 462 F.2d 620 (D.C. Cir. 1972), as an
authority for their position.  In *Green,* two officers were in the process of pulling over an
individual for speeding and running a stop sign when one of the officers **saw** the individual
"leaned over, and it appeared as though his arm was in front of his body, not to the side or to the
rear...[not as if he] was going for his wallet.." *Id.* at 621.  In *Green,* the court ruled that the
weapon the officers found was not the fruit of an illegal search because "[c]onfronted with a
speeding vehicle running a stop sign at 2:00 a.m., they observed the driver making furtive
movements as though pulling something out from his belt and placing it under his seat."*Id*. at
623.

Officer Tolliver did not see Mr. Harris make any furtive movements.  Mr. Harris was not
speeding, erratically changing lanes or running stop signs when Officer Tolliver pulled him over.
Therefore, the circumstances in Mr. Harris' case and in *Green* are vastly different –  Officer
Tolliver did not witness any furtive, suspect movements by Mr. Harris.

In cases where the Court has granted qualified immunity to officers based on the
objective reasonableness of their decisions justifying the violating of an individual's right, the
officers personally witnessed furtive or suspect movements by the individual, had previous run-

ins with the known criminal, were in a high-crime area and knew to look for certain actions. In *Evans,* the court granted officers qualified immunity for using excessive force because both officers testified that they personally saw decedent Evans with a weapon. In *U.S. v. Christian,* 337 U.S. App. D.C. 402 (1999)*,* the court granted the officers qualified immunity because one of the officers saw a dagger blade wedged between the passenger and drivers' seats of the car the individual told the police was his. *See Young v. U.S.*, 140 U.S. App. D.C. 333 (1970). In *Robinson v. District of Columbia,* 2006 U.S. Dist. LEXIS 68122 (D.D.C. 2006), this Court granted officers qualified immunity because the officers were responding to a MPD radio call that described the suspect, suspected of boosting handbags from parked vehicles, at a specific location with a crow bar in his hands.

None of these circumstances were present here. An individual driving by yelled to Officer Tolliver "he put it under his seat, he put it under his seat." The man driving by, if he even existed, did not say what Mr. Harris put under his seat – a CD, plastic bag, drugs, alcohol, a knife, a candy bar or a gun. This unknown man driving by was not a trusted informant or special employee of MPD. Officer Tolliver has never identified the driver. Lastly, Mr. Harris was compliant when Officer Tolliver pulled him over.

Officer Tolliver's actions violated Mr. Harris' constitutional rights. Officer Tolliver did not base his actions on reason or circumstances leading a reasonable officer to take the same actions. In this case, quoting opposing counsel, "Officer Tolliver is either plainly incompetent or knowingly violated Mr. Harris' right." Therefore, qualified immunity does not apply to Officer Tolliver.

-11-

### B. Expert Testimony Concerning Negligent Training and Supervision Is Not Necessary in this Case.

Defendants request the Court strike Plaintiff's negligent training and supervision claim, contending that Mr. Harris must have an expert testify on this issue. An expert opinion, however, is unnecessary in this case.

Concerning expert testimony, *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. App. 1982), stated:

> Proof of a deviation from the proper standard of care does not require expert testimony where the events from which the negligence arose are "within the realm of common knowledge and everyday experience." ... However, expert testimony is required when the subject presented is "so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman."

(Citations omitted).

The District's deviation from its duty to train and supervise Officer Tolliver, however, is well within the "realm of common knowledge and everyday experience."

Officer Tolliver has had previous complaints against him for attacking a civilian and was reprimanded for swearing at an FBI agent while on duty in the District (Attachments: Complaints A-C).[3]

Officer Tolliver never participated in or completed "anger management" training.

(Tolliver Deposition, 26:3-5).

---

[3] Officer Tolliver is the focus of a citizen's complaint that is still open at the Office of Citizen Complaint Review.

-12-

Officer Tolliver also had complaints against him while on the City of Coconut Grove, Florida, police force for failure to follow orders and going outside the chain of command (Attachments: Complaints D-G).

It is within the jury's experience and knowledge to determine if the District of Columbia was negligent in permitting an officer with multiple complaints to continue working and to do so without requiring him to such additional training as "anger management."

Moreover, Defendants have not provided an expert witness themselves to establish that the District was not negligent in its training and supervision of Officer Tolliver.

In *Dyas v. United States*, 376 A.2d 827, 831 (D.C. App. 1977), a criminal defendant argued on appeal that the trial court erred in precluding expert testimony from a psychology professor about the unreliability of eyewitness identification. The Court, however, rejected the need for an expert, explaining that the subject was not beyond the jury's experience. *Id.* at 832.

Likewise, a jury will be able to determine if, given Officer Tolliver's record of complaints against him, the District was negligent in training and supervising this officer. There is no reason, for purposes of this case, for an expert provide an opinion on the training and supervision claim. Police officers are required to deal with the public that they are sworn to protect. They do not have license to abuse a member of the public as Officer Tolliver did. It is completely unreasonable to expect that the District should be allowed to ignore training and supervision to the extent it has done here. The Metropolitan Police Department's decision to promote Officer Tolliver to sergeant does not say much about their stance on this type of conduct.

C.  **Mr. Harris Does Not Need To Address Defendants' Argument That
This Court Should Not Assert Supplemental Jurisdiction.**

Mr. Harris has alleged a viable federal claim against the Defendants.  As demonstrated
above, Officer Tolliver is not entitled to qualified immunity and there is a genuine issue of
material fact about his liability under 42 U.S.C. § 1983.

Even if this Court would dismiss Mr. Harris' claim against Officer Tolliver, this Court
has had jurisdiction of this case since April 7, 2006.  This Court has expended time and resources
in this case.  It has heard arguments, issued decisions, and is familiar with the factual and legal
matters.  Dismissing the supplemental claims at this point would be a waste of judicial effort.

### CONCLUSION

In light of the above, this Court should deny Defendants' Motion to Dismiss or for
Summary Judgment.

Respectfully submitted,

**KLIMASKI & ASSOCIATES, P.C.**

July 23, 2008         */s/ James R. Klimaski*
                     James R. Klimaski, #243543
                     Lynn I. Miller, #941559
                     Megins S. Skolnick, #498452

                     Klimaski & Associates, P.C.
                     1625 Massachusetts Avenue NW
                     Suite 500
                     Washington, DC 20036-2245
                     202-296-5600
                     Fax:  202-296-5601
                     Klimaski@Klimaskilaw.com

                     *Counsel for Ty Harris*

-14-

## CERTIFICATE OF SERVICE

I certify the foregoing ***Plaintiff's Opposition to Defendants' Motion to Dismiss or For Summary Judgment*** and its exhibits and attachments will be served through the Court's CM/ECF Automatic Electronic Notice system on July 23, 2008, to the following counsel for Defendants:

    Melvin W. Bolden
    Asst. D.C. Attorney-General
    Office of the D.C. Attorney-General
    441 4th Street NW
    6th Floor South
    Washington DC  20001
    202-727-3625 Fax

                   _/s/  **Jon Pinkus**_
                   Jon Pinkus
                   Klimaski and Associates, P.C.